**DiSABATO & BOUCKENOOGHE LLC**
David J. DiSabato, Esq.
4 Hilltop Road
Mendham, New Jersey 07945
Tel.: 973-813-2525
Fax: 973-900-8445
ddisabato@disabatolaw.com
Attorneys for Plaintiff, Nicole Duncan

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| NICOLE DUNCAN, | : | |
| | : | |
| Plaintiff, | : | Case No. |
| | : | |
| v. | : | **COMPLAINT AND JURY DEMAND** |
| | : | |
| TOTAL SONO, LLC, | : | |
| | : | |
| Defendant | : | |

Plaintiff Nicole Duncan, by and through counsel, by way of Complaint, hereby alleges and says as follows:

**NATURE OF THE ACTION**

1. Plaintiff Nicole Duncan, who is African-American, suffered a harmful racial slur made by Defendant Total Sono, LLC during Ms. Duncan's April 23, 2018 sonogram procedure. While the procedure was progressing, the Total Sono, LLC technician, who is white, called Ms. Duncan's baby a "monkey."

2. The epithet "monkey" has deep and hateful discriminatory meaning, and had a severe emotional impact on Ms. Duncan, particularly as the term was used against her unborn child during what should have been a special and joyous event in Ms. Duncan's pregnancy.

3.     The technician refused to apologize to Ms. Duncan, and the owner of Total Sono, LLC, Adam J. Duhl, who is also white, subsequently dismissed the racial insult as a "silly colloquialism" and insisted that he, personally, would not have been offended.

4.     Ms. Duncan has suffered severe emotional injury as a result of this incident, and has suffered extreme humiliation and mental anguish. Moreover, she believes that blatant racism such as that which she endured should not be swept under the rug and allowed to continue unchecked in our society and in her community.

## PARTIES

5.     Plaintiff Nicole Duncan resides at 100 Chadwick Avenue, Newark, New Jersey 07108.

6.     Defendant Total Sono, LLC is an active Domestic Limited Liability Company, registered and doing business under the laws of the State of New Jersey, with principal business address of 599 Ramapo Valley Road, Oakland, New Jersey 07436. Total Sono, LLC has two members: Adam J. Duhl with an address of 599 Ramapo Valley Road, Oakland, New Jersey 07436 and Guillermo Laureiro with an address of 751 Willard Avenue, Jefferson Township, Pennsylvania 08436.

## JURISDICTION AND VENUE

7.     The United States District Court has diversity jurisdiction pursuant 28 U.S.C. §1331 (federal question); 28 U.S.C. § 1343 (civil rights); 28 U.S.C. §1367 (supplemental jurisdiction); 28 U.S.C. §2202 (injunctive relief); and 42 U.S.C. §§1981, 1985 and 1988 (civil rights).

8.     Venue in this action properly lies here under 28 U.S.C. §1391 because Defendant's liability to Plaintiff arose within the jurisdictional region of this Court. Plaintiff is a

2

citizen and resident of the State of New Jersey. Defendant maintains a physical presence in this State, conducts substantial business in this State and receives substantial compensation and profits from its business activities in this State so as to subject itself to personal jurisdiction in this State.

## ALLEGATIONS OF FACT

9.     On April 23, 2018, Ms. Duncan and her fiancée went to a sonogram appointment at the Maplewood, New Jersey location of Total Sono. Ms. Duncan was looking forward to the procedure and was excited to see images of her child. Like most expecting couples, Ms. Duncan and her fiancée viewed the sonogram appointment as a joyous step in their path toward parenthood.

10.     Unfortunately, during the procedure, the administering technician referred to Ms. Duncan's unborn child as a "monkey." Ms. Duncan and her fiancée were stunned to hear the racist slur, particularly so given that they expected to be in a tranquil, welcoming environment.

11.     Ms. Duncan and her fiancée confronted the technician and asked for an apology, but the technician refused to acknowledge that she had done anything wrong.

12.     Subsequent to the appointment, Adam J. Duhl, the owner of Total Sono, defended the slur as a "silly colloquialism" that "would not have offended" him.

13.     The term "monkey" is a shockingly hateful and racist epithet used to dehumanize blacks for centuries. Total Sono's employees and Mr. Duhl should be well aware of the deeply derogatory meaning of the term "monkey," particularly as it has been prominent in the National media over the past several years:

(a)     In May of 2016, Fox News was compelled to remove comments to an AP article regarding Malia Obama's decision to attend Harvard University, in which readers referred to her as an "ape," a "monkey" and other racial slurs.

(b)     In January of 2017, singer and music producer John Legend was called a "monkey" by paparazzi, and described the historical context of the offensive slur as follows: " Black folks have had to deal with being called monkeys for a long time and dehumanization has always been kind of a method of racism and subjugation of black people ..."

(c)     In January of 2018, clothing retail giant H&M was roundly criticized and boycotted when it featured an on-line ad depicting a black child in a hoodie labeled with "Coolest Monkey In The Jungle." H&M later publicly apologized for the slur after the enormity of its deeply insensitive gaff was brought to the retailer's attention.[1]

(d)     Most recently, in May of 2018, ABC cancelled its highest rated show, when the show's star, Rosanne Barr, publicly compared a high-profile African-American woman to an "ape." The resulting public outrage focused on the abhorrent and unforgiveable association of African-Americans with animals.

14.     The shocking discrimination exhibited by Total Sono is unacceptable in any context, let alone when directed against an unborn child during a sonogram.

---

[1] In an article reporting on the H&M slur, HuffPost republished an enlightening and disturbing history of the use of the term "monkey" as a racial slur for the black community, citing examples from culture, literature and film over the centuries. A copy of the HuffPost article is annexed hereto as "Exhibit A."

15.    Rather than conduct itself in accordance with a sense of social decency and with the requirements of the law, Total Sono created and maintained an objectively abusive and hostile environment for Ms. Duncan.

16.    The racial bias exhibited by Total Sono's technician was ratified by Total Sono and by Total Sono's owner, Adam J. Duhl, through their failure to take sufficient corrective and remedial action after being notified of the discriminatory conduct of their employee. Not only did the Total Sono and Mr. Duhl fail to adequately intervene after learning of the technician's epithet, Mr. Duhl went so far as to further ratify the hateful conduct by defending the slur as a "silly colloquialism" that "would not have offended" him. Such failure to act, including if necessary, the termination of the offending technician, constitutes acceptance of the unlawful conduct.

17.    This horrific incident has had a detrimental effect on Ms. Duncan's pregnancy, both physically and emotionally. As a result of the foregoing, Ms. Duncan has been unable to sleep and has suffered extreme humiliation, embarrassment, loss of enjoyment of life, alienation and mental anguish.

**COUNT ONE**

**(Federal Race Discrimination, 42 U.S.C. §2000a, *et seq.*)**

18.    Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

19.    42 U.S.C. §2000a provides that all persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation without discrimination or segregation on the grounds of race.

20. The Total Sono location at which Ms. Duncan went for her sonogram appointment is a public accommodation under Title II of the Civil Rights Act of 1964, 42 U.S.C. §2000a(b)(2).

21. The operation of Total Sono affects commerce within the meaning of 42 U.S.C. §2000a(c)(2).

22. Total Sono denied Ms. Duncan full and equal enjoyment of the good, services, facilities, privileges, advantages, and accommodations of Total Sono because of her race when Total Sono's employees, management and owner created and maintained a public accommodation from which Ms. Duncan was effectively barred by virtue of the exiting condition of racial bias demonstrated through the anti-black epithet "monkey" being used against her unborn child, while similarly situated non-black patients were not subjected to such epithets.

23. Total Sono has implemented a policy or practice of denying black patients, including Ms. Duncan, on account of race, the full and equal enjoyment of the good, services, facilities, privileges, advantages, and accommodations on the same basis that it makes such available to non-black patients. This policy has been carried out by denying Ms. Duncan equal treatment as evidenced by the racist slur directed to Ms. Duncan's child and by extension to Ms. Duncan and her fiancée. Total Sono's conduct and ratification of that conduct have the effect of discouraging and denying black patients, including Ms. Duncan, from visiting Total Sono for prenatal medical care.

24. Total Sono's conduct constitutes both disparate treatment and disparate impact in deliberate and substantial disregard of Ms. Duncan's rights.

6

25. As a direct and proximate result of Total Sono's actions and inactions, Ms. Duncan has suffered and continues to suffer injury, loss and damage in an amount to be established at trial.

## COUNT TWO

### (Federal Race Discrimination, 42 U.S.C. §1981, *et seq.*)

26. Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

27. 42 U.S.C. §1981 provides that all persons shall have the same right to make and enforce contracts, and to do so freely of racial discrimination and harassment.

28. The Total Sono facility in question is a place of business that offers members of the public the opportunity to engage and perform contracts for prenatal medical services.

29. Upon information and belief, Total Sono intentionally denied Ms. Duncan the same rights that are afforded to other non-black persons to make and perform such contracts for services, by intentionally engaging in racial discrimination against Plaintiff in violation of §1981 by sustaining, supporting, ratifying and failing to monitor a pattern and practice of refusing to contract with Ms. Duncan on equal terms when Total Sono employees, management and owner said or condoned racial offensive statements.

30. Upon information and belief, Total Sono was motivated by racial animus when it refused to contract on equal terms with Ms. Duncan on the basis of her race.

31. As a direct and proximate result of Total Sono's conduct, Plaintiff has suffered and continues to suffer injury consisting of mental anguish, embarrassment, humiliation and anxiety.

## COUNT THREE

### (New Jersey Law Against Discrimination ("LAD"), N.J.S.A. §§10:5-1 to -49)

32.    Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

33.    The Total Sono location at which Ms. Duncan went for her sonogram appointment is a public accommodation under the LAD.

34.    Total Sono and those employees, management and owners of Total Sono, are owners, proprietors, managers, agents or employees of a business establishment engaged in the sale of goods and service to be purchased on the premises.

35.    During the time that Ms. Duncan was on the premises, other patients were provided with services unaccompanied by offensive racial epithets.

36.    However, Total Sono denied Ms. Duncan the accommodations, advantages, facilities and/or privileges that were provided to other non-black persons, and did so on account of Ms. Duncan's race, thereby intentionally denying her the full enjoyment of the accommodations, advantages, facilities and/or privileges to which she is entitled under the LAD.

37.    Total Sono's conduct constitutes discrimination on the basis of Ms. Duncan's race and is a violation of her rights as guaranteed and protected by the LAD.

38.    Total Sono's failure to adequately address the discriminatory conduct by, if necessary, terminating the employee at issue, combined with Total Sono's owner's pretextual statement that he – a white man – would not have been offended by the racial slur and considered it to be just a "silly colloquialism," demonstrate that Total Sono's conduct is willful and wanton, and is routed in malice and a reckless indifference to Ms. Duncan's rights under the LAD.

39.    As a direct and proximate result of Total Sono's conduct, Plaintiff has suffered and continues to suffer injury consisting of mental anguish, embarrassment, humiliation and anxiety.

## COUNT FOUR

### (Intentional Infliction of Emotional Distress)

40.    Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

41.    Total Sono, by and through its employees, management and owners (each acting within the scope of his or her employment), engaged in the shockingly outrageous conduct alleged herein intentionally, recklessly and maliciously for the purpose of cause Ms. Duncan to suffer humiliation, mental anguish, apprehension and emotional distress.

42.    Total Sono's conduct is the type that cannot be tolerated in a civilized society. Total Sono said and then ratified a horribly offensive and derogatory racial slur during a cherished and special moment in Ms. Duncan's pregnancy, thereby scarring forever Ms. Duncan's memory of her sonogram and her pregnancy.

43.    Total Sono's conduct was outrageous and in reckless disregard for Ms. Duncan's feelings, dignity and fundamental rights as a human being.

44.    Total Sono's owner dismissed the well-known and universally condemned use of the word "monkey" as a "silly colloquialism" further evidencing Total Sono's reckless disregard for Ms. Duncan's feelings and dignity.

45.    As a direct and proximate result of these extreme, outrageous and wanton acts by Total Sono, Ms. Duncan has suffer injury consisting of mental anguish, embarrassment, humiliation, anxiety and severe emotional distress.

## COUNT FIVE

### (Negligent Infliction of Emotional Distress)

46.     Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

47.     Total Sono owed Ms. Duncan a duty to exercise reasonable care in the regulation, supervision and management of the Maplewood, New Jersey Total Sono location, including the duty to exercise reasonable care in hiring, supervising, managing, and training those employees acting on behalf of Total Sono.

48.     Total Sono negligently breached its duty of care to Ms. Duncan so as to fall well below the applicable standard of care and directly, proximately and legally caused harm to Ms. Duncan as described above, specifically by failing to comply with Federal and State laws mandating equal treatment and prohibiting racial discrimination, and by failing to adequately hire, supervise and train those employees acting on behalf of Total Sono.

49.     Total Sono knew or should have known that its failure to exercise due care as described above could result in an incident such as the one complained of here, in which an employee, manager or owner would direct an insensitive racial remark to a patient and severe emotional distress would ensue.

50.     In conducting themselves as alleged in this Complaint, the Total Sono employees, managers and owners were each acting within the course and scope of his or her employment.

51.     As a direct and proximate result of Total Sono's failure to meet the applicable standards of care, and in breach of its duty to Ms. Duncan, Ms. Duncan has suffered and continues to suffer injury, severe emotional distress, harm and damage in an amount to be established at trial.

## COUNT SIX

### (Punitive Damages)

52.     Plaintiff repeats and realleges each of the foregoing allegations as if set forth at length herein.

53.     Total Sono's conduct shows a total and complete disregard for the safety of Ms. Duncan and others and for their fundamental protections under Federal and State laws to be free from racial bias, particularly during a special and emotional event such as a sonogram. Therefore a claim for punitive and/or exemplar damages is appropriate and just under the circumstances.

**WHEREFORE,** Plaintiff demands judgment against Defendant as follows:

A.     Awarding damages incurred as a result of the violation by Defendant of Plaintiff's civil rights under Federal and State law;

B.     Awarding punitive damages against Defendant in an amount commensurate with the magnitude of the racial epithet at issue and the wanton disregard with which Defendant ratified and dismissed its own violations of Federal and State law;

C.     Ordering Defendant to cease all racial discrimination in its facilities and to provide such adequate training and counseling to its employees so as to prevent future racial discrimation;

D.     Awarding attorneys' fees and costs of suit; and

E.     Granting such other and further relief as the Court may deem equitable and just.

## JURY DEMAND PURSUANT TO L.CIV.R. 38.1

Plaintiff demands a trial by jury on all issues so triable.

## CERTIFICATION PURSUANT TO L.CIV.R. 11.2

Pursuant to Local Civil Rule 11.2, I hereby certify, to the best of my knowledge, that the

matter in controversy is not the subject of any other action pending in any court or the subject of

a pending arbitration proceeding, nor is any other action or arbitration contemplated.

Dated: June 4, 2018                    By:    /s/ David J. DiSabato
                                               David J. DiSabato, Esq.
                                               **DiSABATO & BOUCKENOOGHE LLC**
                                               4 Hilltop Road, Mendham, NJ 07945
                                               Tel.: 973-813-2525
                                               Fax: 973-900-8445
                                               ddisabato@disabatolaw.com
                                               *Attorneys for Plaintiff, Nicole Duncan*

# EXHIBIT A

≡                    ✉  f  y  ☉    **EDITION**

Ad closed by Google

Report this ad  |  Why this ad? ▷

AdChoices ▷

***THE BLOG***  02/29/2016 12:11 am ET | Updated Feb 28, 2017

# Comparing Black People to Monkeys has a Long, Dark Simian History

 **By The Conversation Africa**

Wulf D. Hund, *University of Hamburg* and Charles W Mills, *Northwestern University*

*This article is a foundation essay. These are longer than usual and take a wider look at a key issue affecting society.*

In the history of European cultures, the comparison of humans to apes and monkeys was disparaging from its very beginning.

When Plato - by quoting Heraclitus - declared apes ugly in relation to humans and men apish in relation to gods, this was cold comfort for the apes. It transcendentally disconnected them from their human co-primates. The Fathers of the Church went one step further: Saint Gregory of Nazianzus


CR Consumer Reports

That's why we test and rate products to keep you safe.



and Saint Isidore of Seville compared pagans to monkeys.

In the Middle Ages, Christian discourse recognised simians as devilish figures and representatives of lustful and sinful behaviour. As women were subject to an analogous defamation, things proceeded as one would expect. In the 11th century, Cardinal Peter Damian gave an account of a monkey that was the lover of a countess from Liguria. The jealous simian killed her husband and fathered her child.

## Hotbed of monsters

Several centuries later in 1633, John Donne in his Metempsychosis even let one of Adam's daughters be seduced by an ape in a sexual affair. She eagerly reciprocated and became helplessly hooked.

From then on, the sexist manifestation of simianisation was intimately intertwined with its racist dimension. Already Jean Bodin, doyen of the theory of sovereignty, had ascribed the sexual intercourse of animals and humans to Africa south of the Sahara. He characterised the region as a hotbed of monsters, arising from the sexual union of humans and animals.

The history of a narrative by Antonio de Torquemada shows how in this process Africans became demonised and the demons racialised. In the story's first version (1570), a Portuguese woman was exiled to Africa where she was raped by an ape and had his babies.



AdChoices ▷

*TRENDING*

**Military Report: UFOs May Have Attempted Rendezvous With Giant Undersea Object**

**Offering No Evidence, Trump Says Mueller's Investigators 'Will Be Meddling' In Midterms**

**Ted Cruz's Attempt At Tweeting Sports Did Not Go Well**

**8 Unexpected Arrivals As Service Dog Gives Birth At Tampa Airport**

**What Life Was Like 50 Years Ago Compared To Now**
Sponsored by Country Living

**Taylor Swift Told To Shower By Cheeky Interviewer And Fans React**

— **SPONSORED BY TRENDCHASER** —

A good century onwards the story had entered the realm of Europe's great philosophical thought when John Locke in his 1689 essay Concerning Human Understanding, declared that "women have conceived by drills". His intellectual contemporaries knew well that the stage for this transgressing love-and-rape-story was Africa because, according to the wisdom of the time, drills lived in Guinea.

In the following centuries, simianisation would enter into different sciences and humanities. Anthropology, archaeology, biology, ethnology, geology, medicine, philosophy, and, not least, theology were some of the fields.

## King Kong's reel racism

Literature, arts and everyday entertainment also seized on the issue. It popularised its repellent combination of sexist and racist representations. The climax was the hugely successful classic of Hollywood's horror factory, King Kong.

At the time of King Kong's production the public in the US was riveted by a rape trial. The Scottsboro Boys were nine black teenagers accused of having raped two young white women. In 1935 a picture story by the Japanese artist Lin Shi Khan and the lithographer Toni Perez was published. 'Scottsboro Alabama' carried a foreword by Michael Gold, editor of the communist journal New Masses.

One of the 56 images showed the group of the accused young men beside a newspaper with the headline "Guilty Rape". The rest of the picture was

**We Can Guess Your Education Level In 5 Questions**

Wake up to the day's most important news.

Subscribe to The Morning Email.

address@email.com

SUBSCRIBE

filled with a monstrous black simian figure baring its teeth and dragging off a helpless white girl.

The artists fully understood the interplay of racist ideology, reactionary reporting and southern injustice. They recognised that the white public had been thoroughly conditioned by the dehumanising violence of animal comparisons and simianised representations, as in the reel racism of King Kong.

## Labelled with disease

Animalisation and even bacterialisation are widespread elements of racist dehumanisation. They are closely related to the labelling of others with the language of contamination and disease. Images that put men on a level with rats carrying epidemic plagues were part of the ideological escort of anti-Jewish and anti-Chinese racism.

Africa is labelled as a contagious continent incubating pestilences of all sorts in hot muggy jungles, spread by reckless and sexually unrestrained people. AIDS in particular is said to have its origin in the careless dealings of Africans with simians, which they eat or whose blood they use as an aphrodisiac.

This is just the latest chapter in a long and ugly line of stereotypes directed against different people like the Irish or Japanese, and Africans and African Americans in particular. To throw bananas in front of black sportspeople is a common racist provocation even today.



# Why are blacks abused?

What explains this disastrous association of black people defamed as simian? A combination of factors might be the cause:

- the prevalence of a variety of great apes in Africa, closest in size to humans. The Asian great ape population is more limited, while in the Americas one finds monkeys, but no apes;

- the extent of the aesthetic "distance" between whites and blacks, their greater degree from a white perspective of physical "otherness" (deviant not merely in skin colour and hair texture but facial features) as compared to other "nonwhite" races;

- the higher esteem generally accorded by Europeans to Asian as against African civilisations; and

- above all the psychic impact of hundreds of years of racial slavery in modernity, which stamped 'Negroes' as permanent sub-persons, natural slaves, in global consciousness.

Large scale chattel slavery required reducing people to objects. Precisely because of that it also required the most thorough and systematic kind of

dehumanisation in the theorisation of that reality.

# The origin of species

Long before post-Darwinian "scientific racism" begins to develop, then, one can find blacks being depicted as closer to apes on the Great Chain of Being. Take mid-19th century America in circles in which polygenesis (separate origins for the races) was taken seriously. Leading scientists of the day Josiah C. Nott and George R. Gliddon, in their 1854 Types of Mankind, documented what they saw as objective racial hierarchies with illustrations comparing blacks to chimpanzees, gorillas, and orangutans.

As Stephen Jay Gould comments, the book was not a fringe document, but the leading American text on racial differences.

Darwin did not discredit scientific racism with 'On the Origin of Species' - he just refined it. Shutterstock

Darwin's revolutionary 1859 work, On the Origin of Species, did not discredit scientific racism but only its polygenetic variants. Social Darwinism, triumphantly monogenetic, would become the new racial orthodoxy. Global white domination was being taken as proof of the evolutionary superiority of the white race.

If it now had to be conceded that we were all related to the apes, it could nonetheless be insisted that blacks' consanguinity was much closer - perhaps a straightforward identity.

## Tarzan = white skin

Popular culture played a crucial role in disseminating these beliefs. The average American layperson would be unlikely to have been reading scientific journals. But they were certainly reading H. Rider Haggard (author of King Solomon's Mines and She) and Edgar Rice Burroughs (creator of Tarzan). They were going weekly to the movies, including the genre of "jungle movies". They were following daily comic strips like The Phantom - Africa's white supercop, the Ghost-who-walks.

Africa and Africans occupied a special place in the white imaginary, marked by the most shameless misrepresentations. Burroughs would become one of the bestselling authors of the 20th century. Not just in his numerous books, but in the movies made of them and the various cartoon strip and comic spin-offs, of his most famous creation, Tarzan of the Apes.

Tarzan would embed in the Western mind the indelible image of a white man ruling a black continent. "Tar-zan" = "white skin" in Ape, the impressively polyglot Burroughs informs us. It is a world in which the black humans are bestial, simian, while the actual apes are near-human.

Burroughs's work was unprecedented in the degree of its success, but not at all unusual for the

period. Rather, it consolidated a Manichean iconography pervasive throughout the colonial Western world in the first half of the 20th century and lingering still today. In this conflict between light and dark, white European persons rule simian black under-persons.

## Lumumba's announcement

The Belgian cartoonist Hergé's Tintin series, for example, includes the infamous <u>Tintin au Congo</u> book, which likewise depicts Africans as inferior apelike creatures.

Unsurprisingly, "macaques" (monkeys) was one of the racist terms used by whites in the Belgian Congo for blacks, as was "macacos" in Portuguese Africa. In his 1960 Independence Day speech, Congolese leader Patrice Lumumba blasted the oppressive legacy of Belgian colonialism (to the astonishment and outrage of the Belgian king and his coterie, who had expected grateful deference from the natives). He is reputed to have concluded:

> <u>*Nous ne sommes plus vos macaques!*</u> *(We are no longer your monkeys)*

The story seems to be apocryphal - no documentation has been found for it - but its widespread circulation testifies to the decolonial aspiration of millions of Africans. Alas, within less than a year, Lumumba would be dead, assassinated with the connivance of Western agencies, and the country turned over to

neocolonial rule.

# Racist cross-class alliances

The use of simianisation as a racist slur against black people is not yet over, as shown by the furor in South Africa sparked by Penny Sparrow, a white woman, complaining about black New Year's revelers:

> *From now [on] I shall address the blacks of South Africa as monkeys as I see the cute little wild monkeys do the same, pick and drop litter.*

Sparrow's public outburst indicates the deep entrenchment of racial prejudices and stereotypes.

America's First Couple, Barack and Michelle Obama, have been on the receiving end of simianisation.
Reuters/Kevin Lamarque

This does not stop at class boundaries. The internet has overflowed with ape comparisons ever since Barack and Michelle Obama moved into the White House. Even a social-liberal newspaper, like the Belgian De Morgen, has deemed it kind of funny to simianise the First Couple.

Cross-class alliances against declassed others are

a hallmark of racism.

Theodore W. Allen once defined it as "the social death of racial oppression", that is:

> ... the reduction of all members of the oppressed group to one undifferentiated social status, beneath that of any member of the oppressor group.

Animalisation remains a malicious and effective instrument of such a form of desocialisation and dehumanisation. Simianisation is a version of this strategy, which historically manifested a lethal combination of sexism and racism.

---

*Together with Silvia Sebastiani, Wulf D. Hund and Charles W. Mills just edited a volume of the Racism Analysis Yearbook on Simianization. Apes, Gender, Class, and Race. Zürich, Berlin, Wien, Münster: Lit 2015/16 (ISBN 978-3-643-90716-5).*

Wulf D. Hund, Professor Emeritus of Sociology, Department of Socioeconomics, University of Hamburg and Charles W Mills, John Evans Professor of Moral and Intellectual Philosophy, Northwestern University

This article was originally published on The Conversation. Read the original article.

**Follow The Conversation Africa on Twitter: www.twitter.com/TC_Africa**

---

**The Conversation Africa** 🐦